AMERICAN EXPRESS Pensions, and this one is entitled Spending Money, so they're all related. Spending Money v. American Express and Visa 12-1481, Mr. Veal. Thank you, Your Honor. Seated with me is Matt Warnczak of Smith Gambrell and Joe Pastore of Pastore Daily and Shofie. Pleased to court. I started writing patent applications and drafting patent claims in 1981, a few months before this court had its first session. A lot has changed in that time. A lot of legislation, a lot of judicial rulings, a lot of technology changes the order of the day. But something that hasn't changed is the fact that the patentee is entitled to draft his claims and is entitled to claim what he believes his invention is. He's also required to teach how to make and use his invention. And in this case, we're confronted with a situation where the patentee did draft his claims as he wished, and then the court, in its interpretation of those claims, which it's charged to do, engrafted into the limitations of the claim a limitation from the specification. Mr. Veal, as you know from your long time of practice, the claims have to be interpreted in light of the specification. Yes, they do, Your Honor. And the specification tells us that the cards here are functionally identical to credit cards. And apparently they're not, totally. Well, Your Honor. The accused are not. The court below didn't graph that functional equivalence to a credit card limitation in there, however we can... And isn't that because the specification said that's what they are? I think the specification said that the advantages of the card were such that it would have those functional limitations. However, when you look at the claims and that term, satellite spending card in the claims, that term in the preamble there is the name of the thing that is being produced by the method. This is not a card claim, this is a method claim. That card derives its functionality, it derives its character, it derives what it is from what is done in the method of configuring that card. As you say, the method refers to a satellite spending card, and the spec says each of the cards is akin to a conventional credit card having all the attributes and advantages and functionality of such cards. That is what the specification says, Your Honor. And that is what the patentee would like to have had happen when the method that he outlined as his invention was practiced. But when you look at the method that he outlined as his invention, there is no method step in the claim that gives the card that functionality such that it is as a credit card accepted everywhere for all of the rental car agencies and lodges that the district court finally had. So when you're trying to interpret what this card means, you have to look at what the method did to create the card. And there is no method step that somehow says, now this card has all this functionality. The method steps deserve to distinguish the card from the debit card by allowing the card holder, the host card holder, to provide a funding mechanism from credit. How do you reconcile that with all of the language in the specification that clearly equates it to the functionality of a credit card? Well, Your Honor, I look at the specification. I see that the patentee had intended that it would have the advantages of a credit card and the functionality of a credit card. But there is no teaching in the specification as to how to make that happen. There's no method steps outlined in the specification as to how to make that functionality happen. So what the court did was engraft into the definition that the patentee presented a limitation. So are you saying that the definition of the satellite card is contained exclusively within the steps of the method? Yes. The definition of the satellite card has to be contained within the method. And does that have to do with functionality? It has to do with the distinguishment of the card over the prior art. But does it have to do with... I'm sorry. Go ahead. I interrupted you with an answer. It has to do with certain functionalities of the card, such as being able to distinguish from a debit card by drawing resources from a credit line, being able to be distinguished from a secondary card by having a limited cash that can be expended. Well, the problem is once you get into the area of the functionality of the satellite card, it seems like you're in a position of denying what you set forth in the spec or absolutely ignoring inconsistent statements in the spec, which with regard to when they talk about the functionality of the satellite card and the spec, they clearly talk about all of the functionality of credit cards, right? The spec talks about having practically all the functionality of a credit card. And you're saying that the claims talk about a limited functionality, so the spec is wrong and we should ignore it because... Not at all. I mean, I'm not understanding. I'm not saying that you should ignore the specification. That's not my intent at all. I think you have to look at the entirety of the specification. I think that there has to be a teaching by the patentee of how to obtain the specific functionality that this district court said this card had to have. And there is no teaching in the specification of how to have all of the functionality of a credit card. This thing is not a credit card. It has never been intended to be a credit card. And what the court said, there must be something in this method that results in this card having all the functionality of a credit card. And rather than looking at the method steps that the inventor said, these are the method steps that you need to go through to create the card that I want you to have, the court looked at the end result and said, because in the end, some retailers, some hotel operators, some credit card people will not accept this card, it cannot be what I have defined... That's not all the court looked at, though. At least in the case of American Express, they very carefully cabined off both, I think, on the card itself or whatever it is, in their documents that they send to the person who's the cardholder or whatever they are, a long list of limitations. There's a distinction between Visa and Amex in that context. Why don't you discuss that? Well, Visa said that they had several limitations. They had their SV cap where they had supposedly a computer system that would keep these cards out. And the court found that that did not actually happen because there was nothing that would prevent the rental of a car in that computer program that they had, the reservation of a car. They had something printed on their card that said that it's a prepaid card. But, contradictorily to the, and this goes not to the construction unless actually you're looking at the final card to see what the construction is, they said, in our cardholder agreements, which are in evidence, the cardholder agreement says you can't use a prepaid card or a traveler's check card to rent a car or to rent a hotel. But if you do use it, then we will place a hold on your funds. So, in effect, you could. The card was configured. The steps were performed so that the card could, in actuality, be used at a hotel or a rental car. So, giving the cardholder an agreement that says... You're not permitted to and you're in violation of the agreement. But you can still do it. It could be done. It could be used. And for the customers, I mean the rental cars or the hotels, in some of the agreements that they had with the rental cars... Are we talking about Visa now exclusively or are we talking about... No, it's still American Express. Okay, okay. In that situation, some of those agreements with the rental car companies and hotels said, okay, don't use prepaid cards. But if you do accept a prepaid card, it will still be accepted under these particular circumstances. So, when you get to that point, when you're talking about the summary judgment aspect of it, their internal documents present a conflict in the facts as to what actually could happen there. Their internal documents in the record say, you can't, but if you do, you can. And the question is, did they perform all the steps of the method to enable this card to be used or to be created the way the patentee intended? If we start looking at what was the result, instead of looking at the actual method claims that the patentee intended people to go through in creating these cards, then we've completely eviscerated what those claims meant to be. They were thought to define what this card was to be. That's what they were there for, to configure the card, to make the card have its essence and its life. So, we will save the remainder of your time, Mr. Veal. Thank you. And we'll hear from Mr. Arminio, who I think is representing American Express. That's correct, Your Honor. It's going to take nine minutes. Thank you, Your Honor. I think the discussion we've already had is very revealing. As Your Honor, Judge Lurie pointed out, the specification really here is quite telling. We have in column three the language, Your Honor, quoted about how this satellite card is akin to a conventional credit card, having all the attributes and advantages and functionality of such cards. And that's in column three, lines 30 to 36. Later in that same column, around line 60, it goes on a satellite card. We've read the spec, of course. But how about the infringement? Is this a summary judgment of non-infringement? And tell us about the Bucks card. I can only point to my counsel on the Bucks card. That's the Visa program. Tell us about American Express. So, for American Express, we had the travel funds card, which was subsequently renamed the traveler's check card. And what this really was, was an American Express paper traveler's check that's existed for over 100 years, but put into the form of a piece of plastic with a magnetic stripe on the back, like a prepaid card. And what American Express did to distinguish this from a normal American Express card that people have, is they put four levels of restrictions on it, because this is a prepaid card. It doesn't have a line of credit backing it. It doesn't have American Express backing it. It has a specified amount of money allocated to it. So it put restrictions on it. There's a lack of functionality. That's correct. Not a lack of acceptability. Well, when we look at acceptability, there are merchants who just don't accept American Express. We didn't rely on that below. We said this card was configured to have a lack of functionality. It doesn't function in all the ways a regular American Express card would. And we configured it on purpose to have a more limited functionality, again, because it only has that prepaid amount of cash backing it. The idea is that you're not asking a merchant to extend the credit. Is it not? The idea here is, since American Express isn't on the hook, American Express doesn't want merchants to get caught short if a customer uses this prepaid card and exceeds the fixed amount. Then the merchant calls to American Express. The merchant gets upset with American Express. So that's why American Express went out of its way to put these four levels of restrictions. They put it right on the card itself, and we see that in the testimony of Ms. Johnson at A2770. She actually had in her file a personal version of one of the older ones, and there's a picture front and back that's at A2997 with the language right on the card. This isn't a credit card. It can't be used for these certain things. That's a lack of functionality of a credit card. That's the first level of restriction. Then there are the restrictions in the card member agreements that say in every one, this is not a credit card and has a whole list of functions for which this prepaid card cannot be used, or if you had a regular American Express card, it could be used. The next level of restriction was in the merchant agreements. We made agreements with merchants that restricted the types of transactions for which these traveler's check cards could be used. And lastly, we programmed our computer systems at American Express, the SVCAP system, to reject transactions of certain categories with these prepaid cards, transactions that would have been perfectly acceptable and appropriate with a normal, regular American Express. So we went through at American Express and had four layers of restrictions on this card that made it lack the functionality of a credit card. We did that on purpose. One of the arguments Council made was, well, it would still be possible if you violated the agreement. What we have to remember here is these cards, they're all creatures of contract. They're created solely by contract. There's nothing inherently valuable about a certain size piece of plastic with a little magnetic stripe on the back. It's the agreements, the agreements that Amex makes with merchants, that Amex makes with the cardholders. Those agreements are what give this piece of plastic any meaning whatsoever. So we can't, in my view, go and say, oh, well, if we ignore the agreements, we can look at functionality. The piece of plastic with the magnetic stripe has no functionality at all, absent the agreements, so we cannot divorce the two. And when we look at it for American Express, we've got those four levels of restrictions. They all show that this card was not configured to have the same functionality of a credit card as is very well explained in the specification, exactly what kind of functionality that means. When it goes in, rent a hotel room, reserve a car, make purchases over the Internet. So it not only says you have to be like a credit card and have the functionality of it, it explains exactly what kind of functionality it's talking about. So I think in this case, the specification could not be more clear as to what is required, and the evidence, especially for American Express, couldn't be more clear that we had four levels of restrictions to prevent such functionality. I assume that like a traveler's check, if somebody loses this thing because it has a magnetic strip, you can just more quickly cancel what's lost and issue again. This card did have the capability, if you lost it and you were wise enough to write down the serial number or American Express number, you could call them up, have it deactivated, and have a new one issued. So it did have protection like that. It wasn't a bare instrument where whoever had it got the money. You could have it replaced, but it couldn't be used for a broad array of transactions for which a normal, regular American Express card could be used. Unless the panel has any questions, I'll cede any remaining time to my colleague. Mr. Carter, you have six minutes plus the added three from your colleague, if you need. Thank you, Your Honors. I'd like to start by saying that, Mr. Carter, what I'd like you to do is address the distinctions. Your opposing counsel really didn't want to answer that question, but it looks like Amex cabined off a lot more than Visa did in the agreements. What you're showing us is, well, the companies won't take it. Right. Let me address that question. Please. First of all, it is true we've gone about proving non-infringement in a different way than American Express has. And Your Honor has mentioned that it's the decision of the merchants not to accept these cards, and that's one of the arguments that a plaintiff raises for the first time in their reply brief. I wanted to say that the decision of merchants not to accept these cards, it's not a random decision. It's not spiteful, or they are making that decision because the Visa Bucks card is a prepaid card. A prepaid card does not provide the merchants the security that a regular credit card does. It does not extend a line of credit. Were there agreements in evidence on that? Agreements between the cardholders – I'm sorry, between Visa and the rental card agencies? And the cardholders. There are no agreements between Visa and the cardholders that are in evidence. Well, this isn't a problem for you. Therefore, you're relying on acceptance versus on functionality. I mean they could – functionally they could do this. They operate as a credit card. The only thing that stops them is that some merchants are individually prudent enough not to do it. Isn't that a problem for you? Well, I disagree with that, Your Honor. I mean the patent specification specifically calls out the ability to serve as a security deposit as being a function of a credit card. And the reason that the Bucks card cannot serve as a security deposit at rental card agencies is because it does the intrinsic properties of that card. The way the card was set up by Visa and by the issuing banks was such that it did not provide the merchants with the security that they would have if they have a credit card. It functions differently to the merchant from a credit card. It functions differently to the consumer from a credit card. And Visa was certainly aware of that, must have been aware of that when they set up the card. They must have known how it was going to function. So you're saying the way this card is set up, by definition, no prudent person would ever accept it for purposes of these things. Right, exactly. Because of the way the card is configured, because of the way it is set up, it cannot serve as a security deposit to merchants. It does not provide them the level of security that they need to trust someone to run off with a card that's valued at $10,000, $15,000, $20,000 or more. A prepaid card does not provide that functionality to the merchants. Does that answer your question? Well, I should have liked to have seen the language of the agreements rather than just how it worked. Well, I think we have the testimony of Avis' 30B6 designate. We have an affidavit from Hertz. We have their public statements on their websites. We have the statements of Visa's witness, Carrie Varejas, both in declaration form and in the form of a 30B6 witness. I mean, I think we've put on ample evidence that rental car companies do not accept these cards, do not accept prepaid cards as a form of security deposit. And, in fact, if you look at the patent, which goes back to 1997, it specifically distinguishes and calls out prepaid cards. And it said that one of the drawbacks of a prepaid card is that it does not function as a security deposit. So what the plaintiff is trying to prove here is actually something that contradicts what they say in their patent. And I think one of the important things to keep in mind here is that it's plaintiff's burden to come forward with evidence that the accused product actually have this functionality. It's not Visa's evidence to prove the negative. And if you look at their opening brief, they've done nothing of the sort. I mean, all of the evidence that they point to is the absence of certain restrictions. And as we said in our brief, the absence of those restrictions does not affirmatively show that it has the functionality of a credit card, that the accused product has the functionality of a credit card. They raised some additional arguments in their reply brief. I'm happy to address those if you'd like. I think not, Mr. Carter. So we will hear from Mr. Veal, who has a little rebuttal time, about five minutes. Thank you. Thank you, Your Honor. I still haven't heard anything that says that these defendants did not practice this method. I haven't heard anything that says we did not perform these steps. The court below did not find that they did not perform these steps, that our client said these are the steps that are required to identify and make, configure this card. What I did hear from Visa was, no, it can be used as a credit card unless a merchant chooses not to accept it. Now, if a rental card agency… When did they say that? When did they say that? Just now, I believe, Your Honor. I believe I heard him say that it was up to the rental car agencies and the lodging agencies to decide whether they wanted to receive the cards. Ms. Rehas, in her testimony that's in the record, also said it's up to the rental car companies and the lodging establishments… To take it after the fact. To take it after the fact. After it's been created. After the fact that it's been used and they take it as payment. No, Your Honor. To accept it at all. They didn't restrict it saying only after. There's no restriction like that in this card. If a hotel wants to take it as a reservation, they can do that. But I think if I understand his argument, it's that given the functionality of the box card, no legitimate person would do it under these circumstances for these purposes. I think he said because it's a prepaid card. Well, the spending money card, the satellite card, is a prepaid card. What happens is the credit card holder puts a predetermined amount of money on the spending money card, the satellite card. It becomes, in essence, a prepaid card because it doesn't have an unlimited line of credit like a credit card does. But unlike a prepaid gift card that you can go get off of a rack in Target or Walmart that has an amount of money on it. Yeah, but the problem would be, I mean, we're conflating now, I think, the infringement case and the claim construction. I think our discussion with your friend was with regard to accepting, assuming we accept the district court's claim construction, what do we have left with regard to the summary judgment of infringement or non-infringement? Well, Your Honor, I think that whether the merchants accept it by agreement or not, the patent requires certain method steps to be performed. Those method steps have been performed. When you start talking about adding additional steps to it, such as saying you have to have an agreement with some merchant out there, you still have not avoided infringing the patent by adding those additional steps to it. The court, in saying, oh, it doesn't have the functionality, ignores the method steps of the patent. Mr. Field, does the term satellite spending card have an independent meaning to a person's skills in the art? I think that we have said that it did not, Your Honor. However, I think that when you look at the case law and you say look at the specification for that meaning, you still have to look at the claims. And if the claims say these are the qualities that the card has, and at the end of the day you read through all of the claims, and the claims, the steps and the method of configuring that card, give that card sufficient attributes, I don't think you need to reach back into the specification and say, and it also has the full functionality of a credit card, when there's nothing in the specification to teach you how to give it the full functionality of a credit card. If I'm not able to look at the specification and say how do I give it the full functionality of a credit card, then you have a limitation that's not supported in the specification. And the court should not bring in such limitations into the claims. It's an advantage that the patentee hoped to have, but it's not a limitation that should be imported to the claim with no way to know how to make that card have that functionality. No method step to create that functionality. You have to look at the method steps to see what the card is. And when you don't look at the method steps to see what it is, and you don't look at the method steps to see whether it's infringed, then you're looking simply at how is it accepted in the world. And that's all this court did. Thank you for your time. Thank you, Mr. Veal. We'll take the case under advisement.